The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. Be seated. Mr. Kingsbury. May it please the Court, I'm Douglas Kingsbury of the North Carolina Bar. Good morning. Good morning. Your Honor, with your permission, I would like to focus my argument this morning on the first two arguments in the appellate's brief. The first being that Mr. Woods was unfairly denied the opportunity to testify and explain his defense to the jury, and the second being the statement that the prosecutor made to the jury in closing argument that the defendant lied when he testified under oath. And so the Court will understand the significance of those errors and why they rose to the level of prejudicial error and reversible error. I would like to briefly give some context for those errors. This case involved 20 tax returns filed by 12 different tax payers. The tax returns were false, they contained false information, including false identities of dependents on those tax returns. The government's case was that Mr. Woods was the source of that information, and therefore he was guilty of filing false tax returns, wire fraud, identity theft, and aggravated identity theft. Mr. Woods' defense was that he was merely the scrivener, that the taxpayers were the source of the information, and all he did was put down on the tax returns the information that they gave him. To bolster its case, the government built its case on three pillars. Number one, Mr. Woods, they said, stole the identities through his work at the VA. He illegally accessed patient identification from the computer system, and that's how we know he was the source of the false information. Number two, the government says he sold those identities to his customers for $500 apiece. Clearly, he wouldn't be selling them if he wasn't the source of the information. And number three, what the government said was the smoking gun, that is, Exhibit 70, an email which the government said Mr. Woods wrote, and it contained several names, birthdates, and Social Security numbers, to show he was trafficking in this kind of information. Well, there was also circumstantial evidence that you have all these different people using fictitious defendants that have a potential common source. That was the government's argument. Right. Now, Mr. Woods testified in his own defense, and he sought to take the stand and explain to the jury each of those prongs and why he was innocent and the government's evidence was not true. His testimony only lasted 20 pages. It is riddled with objections. I only want to address four for the court this morning so that you get a flavor of what happened here and why it unfairly denied this man the right to present his defense. The first had to do with the smoking gun, Exhibit 70, the email that the government said Mr. Woods sent. He got on the stand to say, that's not my email. I did not write that email. I did not send that email. That is not my email. And we know that because that email shows that it was sent within the VA computer system, the VA system, and you had to be in North Carolina to access the system and send that email. And I was in Arkansas at the time. Furthermore, the government seized all of my computers at work, in my home, my phone. They searched everything. And that email is not anywhere on there because I didn't send it. That's what he tried to say to the jury, which would have been fair and important testimony. And here's what happened. I'm on page 687 of the record, beginning on line 6. Mr. Woods said, and I never, and I know they went and they took all of my computers from the VA to see if I sent that email from within the VA. If you talk about, and then the prosecutor, Your Honor, we're going to object. If he wants to testify to his, you know, he's testifying to what other people did regarding the computers. The prosecutor knows where this is going because he knows that what Mr. Woods is about to say is true. Whoa, whoa, whoa, now. That's not in the record. You're guessing as to what the prosecutor's doing and what he knows and what he's thinking and what his purpose is. I'm not sure we can accept your, as much as I trust you and like you, I'm not sure we can make an opinion on your opinion as to what is going on. And I understand that. And I'm trying to be an advocate for this ban. A good one. Well, I appreciate that. The defendant said, Your Honor, and the prosecutor says that he has firsthand knowledge of. The defendant, Your Honor, and the judge says, and he says this about, well, multiple times as the defendant's testifying, you just testify about what you know about. Tell the jury what happened. Yes, Your Honor, can I, just so they will understand the court. Now, you're going to have an opportunity to argue this case after the close of all the evidence. That's the time for argument. Right now, you should just be telling the jury the facts, what you know of your own knowledge. Mr. Woods, well, from within the VA system, when you send an email, you can tell whether that email came from within the VA prosecutor. Your Honor, I'm going to object. This calls for potential expert testimony here about how the VA system is set up. I mean, as far as their computer system, he's testifying, and Mr. Woods goes on. Your Honor, they said I sent this email, and they went, and I mean, so it is. I mean, so I need to explain. They said I sent this email, and they got the email saying that Michael R. Woods sent the email, so I need to explain how that email came about or where it originated from. And the judge says, do you know where it originated from? And he says, no. Well, I mean, it originated from within the VA. Well, I mean, do you know where it came from? No, sir. And the judge says, well, if you don't know where it came from, you can tell the jury you don't know where it came from. Now, a man has a right to explain not just what happened but why it happened and why he's saying what he's saying that I didn't send this email. And the jury should have heard this, and he never got a chance to explain that. And then he wanted to say, when the government seized all of my computers, they also looked for evidence that I had possessed and accessed any of this information, patient information, because when you access the computer system and open a patient's record, the computer makes a record of that. You can't hide that. And so the government went in, Mr. Woods wanted to say, and looked for where these records had been accessed and looked where I had done any of these things. And it's not there because I didn't. Now, here's what happened. At the bottom of page 688, Mr. Woods said, also, there's no proof of me taking any, and the prosecutor says, objection, argumentative. And the court says, well, that's true. I forget the part where he did say someone else had access to his computer. And that goes back to the smoking gun one. I've now moved on to the next argument, the next thing he wanted to say, which was there's no evidence that these patient's records that were actually on these tax returns were ever accessed by anybody, much less me. That's what he wants to say. Okay? And so the court says, that's true, just tell the jury the facts, and you'll have a chance to argue when we conclude the facts. Tell them either what you know or saw. And all he can think of to say is I did not take any patient information from the VA Medical Center and try to use it as dependence on my client's tax returns. Now, this is important because at the sentencing, Mr. Woods did get to present this information to the court. And this matter was litigated in full. In fact, it took two days because the government sought to enhance his sentence for abuse of position of trust for accessing these patient records. And Mr. Woods said, I didn't do it. And the evidence will show I didn't do it. And it took two days. The government had to bring in a computer person to testify. And at the end of the hearing, the judge said to the government, you haven't convinced me even by a preponderance of the evidence that this man ever accessed these computer records, and I overruled the government's, it was actually our, I sustained the defendant's objection that he ever accessed, to enhance because he accessed patient records. The jury should have heard that. The jury should have known that. That was an Achilles heel in the government's case that the jury never got to hear. Let me address, if I may, Your Honor, two more quickly. He could have just said, I didn't access those records. He tried to not only say that, but to. I guess the problem I have with your argument in this is this is such a tough spot for a trial judge to be in. You know, when somebody elects to represent themselves, and you're just trying to, and you have a jury, and you're trying to keep everything going, trying to, I mean, it's probably one of the most difficult things a trial judge does. And so, sure, maybe the trial judge could have done a better job. But isn't this one of the inherent risks that a defendant takes, that it's not going to be as good a trial as maybe it could have been when the defendant doesn't know the law and doesn't know the difference between argument and non-argument? I mean, these are risks inherent in self-representation, and that's why courts tell people to think very carefully before they do it. I do not disagree with that at all. And the district court judge is an experienced judge. He's a good judge. He knows the law, and I believe he tried to do the best that he could here. But let me point this out. This man's testimony took only 20 pages. The government presented 685 pages of testimony. This man was not being disruptive. He was not being impolite or disrespectful to the court, and he was not off wandering on things wasting the jury or the court's time. And I do think that makes a difference. If I can briefly address just two more of these instances where this man was trying to explain his defense. One of the taxpayers who testified was a man named Charles Bailey. Three of Mr. Bailey's tax returns formed the basis of three of the counts of conviction on false returns and one of the counts on identity theft and one of the counts on aggravated identity theft. This was an important witness to five of the counts of which this man was convicted. And what Mr. Woods wanted to say, that I didn't provide any false information on these returns. What would happen is there was a woman named Sheila Quick. She was an accountant, a bookkeeper who Mr. Bailey knew. And every year, and this happened year after year, Mr. Bailey took his tax information to Sheila Quick, and Sheila Quick would organize it and put out his income, his expenses, and his dependents. And Mr. Bailey would bring Ms. Quick's work to me, and I simply filled in on Mr. Bailey's tax return that information. Now, he should be entitled to say that to the jury, to explain that. And here's what happened, and I'm on page 680 of the record. And Mr. Bailey came in and testified that I prepared his returns. I never prepared Mr. Bailey's returns. He brought up the name Sheila Quick, and the government says, Your Honor, he wants to make the statement his position is the fact that he didn't prepare the returns. That's fine, but now we're getting into argument about it. And the court says, Well, just state what you did or didn't do, Mr. Woods, if you would. And the defendant said, The returns prepared and brought to my tax service, and I entered the information in, and that's all that I did to that return. Now, he should have been able to explain the basis for that statement and what actually happened. He should have been able to tell the jury that. And all about Ms. Quick, and that she was the source of this information, and that he did not, just simply copied what she did, and the jury didn't get to hear that. And lastly, with respect to these $500 payments, Mr. Woods wanted to explain to the jury that these were not, I was not charging my customers $500 for a dependent. What happened was, eventually, customers would come to me and say, Hey, these other tax services are providing cash advance services, $200, $500. And, you know, we like you, Mr. Woods, but if I'm going to come back and have you do, can you offer me cash advance against my refund? And Mr. Woods wanted to explain that that's what's happening with these $500 payments. And here's what happened, and I'm on page 686 of the record. Mr. Woods, in prior years, Jackson Hewitt, H&R Block, were taking business, because they were offering those instant loans. And I mean, if you've got clients, and they're loyal to you, and they're going to come to you, and they come and go, Mr. Woods, are you offering any type of instant loans, like the other tax services, or like Jackson Hewitt, and the prosecutor says, Your Honor, we're going to object on hearsay. He's testifying to what other people did. The court sustained. He's not offering that to prove the truth of the matter asserted. He's offering to explain why he did what he did, which he should have been allowed to do. And the defense says, And when I did lend people money, then they would pay me back during the tax season, and I loaned some of them $500. And I know that the eternal revenue would want the paid preparers to be held responsible for everything that goes on within the tax client. But to be honest, when a client comes to you, and the government objects again, and the court instructs the defendant, just tell the jury what happened. And all I'm saying is he should have been permitted to offer context and explanation for what happened to support his version of the case. Mr. Kingsbury, let me ask you this. Yes. After he had testified and after he'd undergone extensive cross-examination by the government, on page 752, the court asked him at the conclusion, Do you have anything further you want to say? And he said no. Yeah. I'm sorry. Let me hear your argument on that. Yes. That is after, and my memory may not be exact here, eight times when the judge said, Now, but what you can say is only the facts. We're not going to hear explanations or arguments, and he couldn't think of anything else to say that was within that narrow window of you can only tell the facts. And that's not the law of evidence of what he should have been allowed to say. He was very polite. You can tell from this record, and he didn't want to step over the bounds. If I could briefly address this second assignment there, because it spills over from this last one where he was trying to explain about these $500 payments. The government took the position, as I said, that these payments were charging the clients for these identities. Now, and this is what they said that the defendant lied when he took the stand. He lied when he said these weren't $500 payments for these identities. The evidence on this issue was paper thin for the government. They put up 20 checks and money orders, 20. As to 19 of those, they didn't put on the taxpayer who wrote the check or the money order. The one man who took the stand who did a money order said, Well, it was my understanding that that was for a dependent, but I didn't get that from Mr. Woods. Or this is James Hester. I didn't get that from anybody at Mr. Woods' office. I was told by a friend, an unnamed friend who didn't testify, that you were supposed to pay $500 for a dependent, but I never talked to Mr. Woods about that, and I just sent in the money. The first day, I just put $500 on the counter and left. I didn't even give it to anybody. And the second day, I just mailed in a money order. None of the 12 taxpayers who testified in this case testified they ever had a conversation with Mr. Woods about a fee for a dependent, $500 or anything, not one of them. So the evidence was paper thin on this point. And the prosecutor, in his closing argument, looked at that jury and said, When that man, pointing to the defendant, testified, he lied when he said that those weren't receipts for selling dependents. It was very misleading. The prosecutor says nothing about the fact that we didn't call 19 of the 20 people who paid these. He didn't mention the fact that we don't have a single witness who ever said he had a conversation with Woods where Woods was charging a fee, $500 or anything, for these dependents. He short-circuited the entire process by saying he lied. He lied about that. This court, United States v. Moore, said it is wrong for a prosecutor to say that a defendant or a witness lied and said that it is error. In fact, said it is plain error. And the reason why we have that rule is because when lawyers get up there and say that somebody lied or somebody told the truth, they are presenting evidence that did not come from the witness stand. And study after study, and I'm being an advocate here, I'm not some great trial lawyer, but I've tried a bunch, shows that jurors believe that the lawyers know the truth about what happened in a case and that they know things that did not get presented. Well, let me ask you, we issued a case in May called United States v. Powell where we said we have not determined whether describing a defendant as a liar is per se improper. Yes, I've read that. To rise to the level of plain error. Isn't that correct? Didn't we say that? Yes, but with all due respect, Judge Keenan, I think there is a mistake in that opinion in that it said we've never held that this is improper. And I don't believe that that panel was aware of the decision in U.S. v. Moore. Well, more clearly and very plainly, Judge Hamilton could not have been more plain. Yes. In terms of saying that it was error or that it was improper. But I think that Judge Floyd's point in Powell, wasn't it that we've never said that it rises to the level of plain error? Isn't that what Judge Floyd was saying in Powell? Well, I believe you're correct. But Judge Hamilton said it is plain error. The error is plain. And then they did not reverse because they found that it did not violate the substantive rights of the defendant given, among other things, the overwhelming evidence and the other of the four factors. But I promise you, Judge Hamilton said not only is it error, it is plain error. I promise you that's in the opinion of U.S. v. Moore. And I think the panel, and my red light is on. But the panel in Powell, unfortunately, was not aware of the, I don't believe it was aware because it wasn't cited that I could see anywhere. And as the court is aware, the rules of the Fourth Circuit are, if there are two opinions that are in conflict like this, it is the earlier opinion that controls. You've got some time remaining. Let's hear from the Governor. Thank you. Thank you. Good morning. May I please support? My name is Yvonne Watford McKinney, and I'm here on behalf of the United States. Your Honors, with respect to the first issue that counsel raised, whether the district court limited unfairly the defendant's ability to testify on his own direct, the government obviously believes otherwise. The court in this case allowed the defendant to testify to virtually everything he wanted to say. The court did not arbitrarily limit his testimony. The court directed it, guided it, ensured that it had control of the court and the testimony, as Rule 104 allows it to do. Regarding the objection to the defendant speaking about the e-mail, the defendant said, I didn't send that e-mail. And he went on to say how Montina Ladson had access to his computers, to everything in his office, suggesting that she was at the bottom of the e-mail. In addition, counsel said, made the statement that the defendant said that there was no evidence that patient records were accessed by anyone. That wasn't a testimony. The defendant got to say that there was no evidence that patient records were accessed because of some theft that had occurred sometime before. Regarding Mr. Charles Bailey, the defendant talked about Charles Bailey. He said he didn't, as I recall, he said he didn't remember preparing Charles Bailey's return. Regarding the $500 payments, the defendant said those payments were not with regard to his tax business. So I guess my point is this. What the defendant needed to say, he got to say. There's no evidence here that the court arbitrarily limited his testimony. As a matter of fact, I do want to point out one thing, knowing Judge Fox. Judge Fox, on at least one occasion, told the defendant, you don't want to repeat testimony. And I think Judge Fox did that in aiding the defendant because repeating testimony of government witnesses would do nothing but reinforce that testimony in the minds of the jury. So Judge Fox cautioned the defendant, but he didn't arbitrarily limit him. And again, the defendant got to say what he needed to say, both on his direct and certainly in his closing argument he went over all of his direct testimony, as I remember the record. In addition, there was no objection coming from the defendant or standby counsel. And Wiggins is a case that's all Standby counsel can't stand up and object if the defendant doesn't. That would be a procedure I'm not familiar with. No, Your Honor, I think that he could ask to approach the bench. And I think that Wiggins would allow him to do that. I thought the standby counsel was there for a consultation if the defendant chose to ask him a question, not to participate. Well, Wiggins broadens the ability of standby counsel to even intercede on defendant's behalf during a trial. I think that's what Wiggins was all about. It gave standby counsel the right not to control the defendant's case or the defendant's pursuit of his own defense, but to assist the defendant by objecting if there needed to be an objection or by counseling him or whatever needed to take place that would not take control of the case away from the defendant. That's how I read the Wiggins case. Because in that case, the defendant in that case did not, he absolutely did not want his attorney to assist him in any way. And defense counsel, standby counsel was in a quandary as to what to do. And when that case came to the Supreme Court, the Supreme Court said that standby counsel does not have to be hamstrung by a defendant. He can object. He can do other things that are routine in working with his client, in assisting his client. And certainly objections, sidebar counsels are routine activities that counsel can engage in. Your Honor, regarding the third issue of the prosecutor's statement that the defendant lied, Your Honor, our position is that that did not deprive the defendant of a fair trial. Why is the government still doing this, calling a defendant a liar? Can you help us there? Well, I don't... I mean, here we are 20 years after Moore. Judge Hamilton could not have been more clear, and Mr. Kingsbury's correct. Judge Hamilton said, the court said, that this error was plain. And then follows by saying, fortunately for the government, he's failed to establish that it affected his substantial rights. Why is the government still doing this? Well, Your Honor, I... I mean, it's just such a shot across the bow. I mean, why? I understand. I understand where the court is going, what the court is saying here. And certainly, it's not good form to ever say... No, it's worse than not good form. You don't call a defendant a liar when the defendant is on trial and facing incarceration. No, you don't, and I don't disagree with the court. But what I would say regarding this, if I can kind of put this in context as I read the record, this prosecutor was speaking specifically about $500 payments. He had five key points in the trial, and he was addressing one of those points, and that was the defendant took substantial money after doing these tax returns through the $500 payments. He indicated that that was an important source of money in the case. He indicated that sometimes, you know, the $500 payments were made in checks, money orders, sometimes in cash. Let me interrupt. We know what he's talking about. The question is, why is he using this word when it's been told clearly he can't do this? Because, Your Honor, in this case, this evidence was flatly contradictory. I know. So what? You aren't trying to defend the prosecutor's conduct here, are you? It sounds to me like you are. Well, I'm not trying to defend the conduct. See, I think this is part of the problem. I don't think the government is getting it. There's no basis on which you can defend that conduct. Well, Your Honor, I'm not trying to defend it, but what I am trying to show is that the error was not such that should lead to a reversal. Well, then I think that's where your focus should be here. And the reason why I say that is this was a remark that did not mislead the jury. I'm going to the factors, I believe, in the Moore case. The remark did not mislead the jury. Because the evidence was so contradictory, the jury knew that someone here wasn't telling the truth. And so what the government did was it talked about the 12 witnesses that came in and testified about the defendant preparing their tax returns. Several of the witnesses, Erica Miller being one, talked about the fact that the defendant told her that she had to pay him $500 in cash. And he did her return several years running, Wanda Beasley. And her husband talked about the fact after the wife's return was done, she got a phone call, first from Larry Williams, and then she spoke with the defendant, at least the husband spoke with the defendant. And the defendant asked, how do you think your return was so good? This is when he was trying to get $600 from her for the dependents that he used in filing her returns. So the evidence was contradictory, very contradictory. And so the jury couldn't mislead because they knew someone here was not telling the truth. The remark was also isolated. It was stated one time. The weight of the government's evidence, we believe, was strong. We had the 12 witnesses. We had the six victims. Actually, there were seven victims in this case. Six victims testified. And the brother of the seventh victim testified that they were all VA patients. They were all under disability. They had all been treated at hospitals in North Carolina and, I believe, Virginia. The defendant we know from the other evidence had access to all of that information. Lastly, the prosecutor's remark, it was deliberate. It was a deliberate remark. But it went only to the $500 payments. As I said, there were five key areas that the government had in this case. But the $500 payments was only one area, and he spoke specifically about that one area. Okay, let me ask you about your brief. On page 60 of your brief on this issue, you say that government counsel did not call the defendant a liar, nor did counsel express his personal opinion about the defendant's veracity. Rather, counsel commented on the veracity of the defendant's testimony. Now, why did you say that? You know, this really does not assist the inquiry to say that the counsel did not call the defendant a liar when counsel said he lied about it under oath. Well, Your Honor, when I said that he didn't call him a liar, I was speaking very literally. And I see that the court's... Well, you said, nor did counsel express his personal opinion about the defendant's veracity. Well, Your Honor, I think he... Well, do you believe that? I think he was talking directly from the evidence. I don't think that that was his personal opinion. I think what he was saying was, after going through all the things that he went through before making that statement, he was commenting on the evidence. The evidence, and that certainly would have been a better way of saying it. The evidence shows that this defendant is not to be believed. So I don't think it was his personal opinion. So you're back to saying it's okay. No, no, I'm not saying it's okay. I'm not saying that at all. What I'm saying is that what he said was based on the evidence and based on the cross-examination, where Prosecutor Duffy showed him check after check after check after check, and he continued in saying that those payments were not in connection with his tax business. It was there that he said what he said. And so that's why I said that it wasn't a personal opinion. It was an opinion based on the evidence. Let me ask you a question about a point that was not argued in oral argument but brought up in the briefs. The defendant wanted a charge on character evidence. Yes. The judge declined to give it because, in his view, the witness's testimony upon whom the defendant depended was equivocal. Yes, sir. His response about his view of the defendant's character. The reason he was equivocal was because the government had asked him, isn't it fair to say that the information that you've been presented with here calls into question the defendant's integrity, and the witness said yes. Now, would you agree that that's an improper question, that you cannot ask a character witness a guilt-assuming question? I don't really know how to answer that question, Your Honor, because I think— Well, the rule is, generally speaking, when a defendant puts up a character witness, you can't impeach their testimony by asking them to assume the guilt of the defendant for the crime on which they're on trial. That's an improper question. Our cases are quite clear that that's an improper question. You can't do that. So the reason that the charge was refused was because of the witness's answer to an improper question by the government. So where does that leave us now with regard to— Well, Your Honor, I will say that there was at least one other instance or one other question that was asked of the witness, which I think would go towards character, and that is he was asked whether or not, after he was interviewed by federal agents, whether or not he withdrew Mr. Woods' ability to work from his home. The evidence was that Mr. Woods was working for the VA from his home. After he was interviewed, his supervisor withdrew that right for him to work from his home. And I think that also was some assessment that was made by the witness of Mr. Woods' credibility. So I think even in that, that was not equivocal, and that was not a comment on all of the evidence that came in, but that was the supervisor making a decision that there's something here that's calling Mr. Woods' integrity or his credibility into question. So I think even at that, the judge could have denied the instruction. Okay, I think we understand your point. Let's hear from Mr. Kingsbury in reply. Thank you. The evidence on this issue about which the prosecutor told the jury the defendant lied was not conclusive. As I said, they didn't even produce 19 of the 20 people who wrote those things, and they produced not a single witness who said, I ever talked to Mr. Woods, that this was the fee or charge or something he was charging me for these defendants. Mr. Woods had the right to testify in his own defense, to explain his case and have his credibility be judged with proper jury instructions, and to not have the prosecutor get up there in the final word and say, I represent the United States of America, and he lied to you. Now, maybe they do that in other parts of the world. Maybe that's how they try cases in parts of the Middle East, but not here in the United States and not in the Fourth Circuit. That is not how we try cases. Now, no single criminal case is more important than the integrity of the criminal justice system. Not one. And I urge you, as the protectors of that system, as the guardians of that system in this circuit, I urge you to protect it. Thank you, Mr. Gainsbury. I notice that you're court-appointed. We appreciate very much your undertaking representation of this plan, and you have done an admirable job. We appreciate it. We'll come down and greet counsel, and then we'll go into our next case.
judges: William B. Traxler, Jr., Barbara Milano Keenan, Stephanie D. Thacker